**UNITED STATES of America, Plaintiff,**

v.

**Robert SKALSKY, Defendant.**

**Crim. No. 85–121.**

United States District Court,
D. New Jersey.

Nov. 7, 1985.

U.S. Dept. of Justice by George E. Wilson, Sp. Atty., Camden, N.J., for plaintiff.

Wolf, Block, Schorr & Solis-Cohen by Gregory T. Magarity, Nancy D'Mara Ezold, Philadelphia, Pa., for defendant.

OPINION

COHEN, Senior District Judge:

In the course of conducting a criminal investigation, the Government may be prompted to offer prosecutorial immunity to a witness in order to ensure his cooperation or assistance. The extent of cooperation which can reasonably be required of such a witness is an issue of obvious importance. The critical issue confronting this Court in the present case is: What degree of cooperation is the Government entitled to expect of a witness who has received the Government's conditional written promise that he will not be prosecuted, based on the information he supplies, if he answers truthfully, accurately, and completely all questions asked of him in connection with a government investigation of one of his business associates? Research by counsel and this Court has revealed no general standard defining the scope of an immunized witness' duty to disclose specific information during questioning by the Government.

Giving rise to the instant motion was the return of an indictment for income tax evasion against the defendant, Robert Skalsky. Defendant seeks dismissal of that indictment on the grounds that prosecution is

precluded by a non-prosecution agreement between himself and the Government.

Defendant's motion originally came before this Court in August, 1985. At that time we reserved decision pending a limited evidentiary hearing which would "add some flesh to" the Government's skeletal allegations that the defendant had breached the non-prosecution agreement at issue. *See United States v. Skalsky*, 616 F.Supp. 676, 681 (D.N.J.1985). Based upon all of the evidence adduced at that hearing and the applicable law, we now deny defendant's motion to dismiss the indictment. This opinion is submitted in lieu of findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52(a).

### BACKGROUND

On April 10, 1985 the Grand Jury returned a three count indictment against the defendant, charging him with willfully and knowingly attempting to evade and defeat payment of income taxes for the calendar years 1978 (Count I), 1979 (Count II) and 1961 through 1964 (Count III). Thereafter, the defendant filed the present motion to dismiss the indictment, arguing that an agreement between himself and the Government dated April 15, 1980 prohibited the Government from pursuing the prosecution. The circumstances surrounding the execution of that agreement follow.

In early 1980, the defendant was notified that the Government sought information from him concerning the business affairs of one of his associates, Emmanuel Gambino, who, at that time, was under investigation for income tax evasion. A "letter of interview" (requesting his appearance on March 7, 1980) was sent to the defendant on February 28, 1980. He did not respond thereto, (Tr. at 19), and on March 11, 1980 a subpoena was issued requiring him to appear on March 25, 1980 before a federal grand jury. (Tr. at 20). On March 21, 1980, Michael K. Simon, Esquire, the defendant's attorney at that time, who is also his son-in-law, placed a call to the Govern-

ment's counsel, Special Attorney George E. Wilson, which was returned by Mr. Wilson on March 24, 1980. During that conversation, an adjournment of the defendant's grand jury appearance was arranged. It was agreed that the defendant would appear on April 15, 1980. On that date, prior to submitting himself to questioning, he entered into an agreement with the Government. (Attached hereto as "Exhibit A"). This agreement proffered immunity from future prosecution based upon information supplied by the defendant in exchange for the truthful disclosure of all information regarding his activities in connection with Emmanuel Gambino. Some changes in the original wording of the agreement were made by the defendant's attorney,[1] and the agreement was signed by the defendant, his attorney, and Mr. Wilson.

After the agreement was executed, the defendant was interviewed by two Internal Revenue Service ("I.R.S.") Special Agents, Paul J. Gould and Donald J. Pisker. Defendant then appeared before the Grand Jury. Several months thereafter, the Government, through Mr. Wilson and Special Agent Charles Schmidheiser, determined that the defendant had omitted certain material information from his statements to the Special Agents and the Grand Jury. (Tr. at 91 & 100). As a result of these determinations, defendant's counsel was notified by letter of July 10, 1981 that the earlier agreement would no longer be given any force and effect. (Attached hereto as "Exhibit B").

In our previous opinion on this motion, we held that the April 15 agreement was a valid contract between the defendant and the Government which, if breached by the defendant, would expose him to prosecution. *Id.* at 680. We further found that the Government's allegation of breach which related to the defendant's real estate dealings with Mr. Gambino in Atlantic City, New Jersey, if proven, would be material,

---

**1.** The change requested by Mr. Simon was the addition of the last sentence of the third para-

graph of the letter/agreement. (Tr. at 136).

and would therefore warrant the Government's voiding of the agreement. *Id.* at 681. Because the case was a criminal one, however, in which the defendant is entitled to a presumption of innocence, we declined to hold that the Government's proof of defendant's breach was adequate as of August 26, 1985. *Id.* at 680–81. Instead, we held that a limited evidentiary hearing was required on the issue of the defendant's breach of the agreement, and we placed upon the Government the onus of proving, in that hearing, by clear and convincing evidence, that the defendant had breached the agreement. *Id.* at 681.

**THE EVIDENTIARY HEARING**

The evidentiary hearing was conducted to resolve two factual issues relating to the defendant's testimony about his dealings with Mr. Gambino. The Government had the burden of establishing, by clear and convincing evidence, (1) that prior to the date the defendant testified before the Grand Jury, he and Mr. Gambino had received and divided one quarter of a million dollars in settlement of a lawsuit concerning real estate in Atlantic City, New Jersey, and (2) that on the day he testified before the Grand Jury pursuant to an agreement not to prosecute, the defendant breached this agreement by giving false, incomplete, or misleading testimony with respect to the Atlantic City real estate transactions.

At the hearing, the Government presented the testimony of four witnesses and, with the consent of the defendant, the affidavit ("Stipulation of Expected Testimony") of a fifth witness. Ample opportunity was provided for the cross-examination of these witnesses. One witness for the defense was presented. Numerous exhibits were admitted and, subsequent to the hearing, briefs and proposed findings of fact were submitted by each party.

The witnesses called by the Government were:

(1) Paul J. Gould, Special Agent with the Criminal Investigation Division of the I.R.S. throughout March and April of 1980, who conducted the April 15, 1980 interview with the defendant;

(2) Donald J. Pisker, the Internal Revenue Agent who assisted Special Agent Gould in the April 15, 1980 interview;

(3) Charles J. Schmidheiser, a Special Agent with the Criminal Investigation Division of the I.R.S., who was assigned to the Gambino investigation subsequent to Special Agent Gould's retirement from federal service;

(4) George E. Wilson, the Special Attorney with the U.S. Department of Justice, Organized Crime and Racketeering Section, who conducted the questioning of the defendant before the Grand Jury on April 15, 1980; and

(5) Leonard Horn, Esquire, (by Stipulation of Expected Testimony) the attorney for Gary and Louis Malamut, the parties who paid Skalsky and Gambino $250,000 in settlement of the suit regarding the Atlantic City properties.

The witness called by the defense was Michael K. Simon, Esquire, the defendant's son-in-law, who served as his counsel on April 15, 1980.[2]

The exhibits introduced into evidence included: Agent Gould's Chronological Worksheet, his outline of questions for the defendant, and his typewritten memorandum of April 16, 1980 to the I.R.S. files; Agent Pisker's handwritten memorandum of April 16, 1980 to the I.R.S. files (summarizing the interview of April 15); and Mr. Simon's handwritten notes of April 15, 1980 (chronicling the interview), and typewritten memorandum of June 20, 1985 prepared at the request of the defendant's present counsel (summarizing the interview of April 15, 1980).

The testimony of the witnesses, the exhibits presented at the hearing, and the post-hearing submissions of both the Government and the defendant have been fully considered. This Court has had the opportunity to observe the manner and demeanor of the witnesses, and our assess-

---

**2.** Mr. Simon testified that he remained the defendant's attorney until July 1981. (Tr. at 155).

ments of their credibility are necessarily reflected in our ultimate findings.

## DISCUSSION

Prior to April 15, 1980, the defendant had received and divided with Mr. Gambino $250,000.00 in settlement of a lawsuit filed to enforce an option to buy certain real estate in Atlantic City referred to as the "Shelburne Hotel." The defendant does not dispute this fact.[3] Clear and convincing evidence, in the form of stipulated testimony by Leonard C. Horn, counsel for the parties from whom the money was received, and copies of several cancelled checks—two dated June 30, 1978 (one payable to the defendant for $50,000.00 and the other payable to Mr. Gambino for $50,000.00), and two dated July 2, 1979 (one endorsed and marked payable to both the defendant and Mr. Gambino for $35,000.00, and another similarly endorsed and marked payable for $115,000.00), has been adduced by the Government to prove that Messrs. Skalsky and Gambino received and divided $250,000.00 during June and July of 1979.

At the interview on April 15, 1980 and during his testimony before the Grand Jury that same day, the defendant failed to disclose that either he or Mr. Gambino had received any money in connection with their attempt to acquire the Shelburne property. The defendant does not dispute this fact. Indeed, upon cross-examination at the evidentiary hearing, Mr. Simon, defendant's counsel during 1980, who was present at the April 15, 1980 questioning, admitted that the defendant did not reveal that the Shelburne matter had been settled. (Tr. at 195). Defendant's failure to disclose the receipt of the settlement money has been established by clear and convincing evidence.

We hold that this failure to disclose the receipt of $250,000.00 was a breach of the agreement the defendant made with the Government on April 15, 1980. When he signed the April 15 agreement, the defendant obligated himself, in the words of the agreement, to "give complete, truthful and accurate information and testimony". In return for his complete and truthful testimony, defendant was to receive immunity from prosecution for any potential charges based upon information he supplied. By the execution of the contract, defendant agreed to cooperate with the Government, and, as a *quid pro quo*, the Government agreed not to use the information he supplied against him. Now, when confronted with the Government's assertion that he failed to live up to his promise to disclose truthful, accurate, and complete information, the defendant claims that he was not explicitly asked for the specific information concerning the receipt of the money from the Shelburne litigation, and that therefore he is not in breach. He also contends that he was excused from performance under the contract. He maintains that the Government had orally agreed to permit him to review the Agent's notes of the interview, but that the Government failed to provide him with such an opportunity. *See* Defendant's Brief at 23–24. He urges that this failure by the Government was a breach of a bilateral contract and that therefore he was discharged from all liability on the contract. This argument is unavailing for several reasons. Foremost among those reasons is our finding that such an alleged breach on the part of the Government would not constitute a material breach so as to relieve the witness of his primary obligation under the agreement, particularly when, as here, the witness does not allege that the notes are inaccurate.

Defendant's position that he had no obligation to disclose the fact that money had been realized in the Shelburne transaction represents an unreasonably narrow reading of the agreement. A careful review of the contract itself reveals that the Government's promise is expressly conditioned upon *complete* disclosure by the defendant. Furthermore, when the Government, in the

---

3. At the hearing, in response to questioning by the Court, Mr. Simon, the attorney who served as defendant's counsel in 1980, admitted that he also knew, before April 15, 1980, that the defendant and Mr. Gambino had received and divided the settlement money. (Tr. at 196–97).

exercise of its discretion, grants immunity or, as here, agrees not to prosecute, we hold that more is required of the recipient than just to respond narrowly or evasively to specific questions. The spirit of cooperation demands more. Defendant relies upon *United States v. Sanderson*, 498 F.Supp. 273 (M.D.Fla.1980), for the proposition that his responses were legally sufficient. *Sanderson*, however, is inapposite. In that case the court held that absent a contractual agreement to the contrary, a witness had no continuing duty to volunteer information acquired subsequent to government questioning. We do not here decide the extent of a witness' continuing duty, if any, to volunteer information acquired subsequent to government inquiry.

In the case at bar, the defendant knew that the purpose of the Government's investigation was to ascertain Mr. Gambino's income. Defendant does not dispute that he was *aware* of the purpose of the Government's investigation. He argues instead that the Government has not proven, by clear and convincing evidence, that the agents *told* him the nature of the investigation. *See* Defendant's Brief at 15. This contention is not only refuted by Mr. Simon's testimony at the evidentiary hearing—when he admitted on cross-examination that he probably did ask what the investigation was about during his March 24, 1980 telephone conversation with Mr. Wilson (Tr. at 178–79)—it also misses the mark. For the purpose of determining whether the defendant had an obligation to disclose the receipt of a large sum of money, it is his *comprehension* of the purpose of the Government's investigation which is relevant. On the basis of the evidence presented in this case, particularly Mr. Simon's own memorandum summarizing the April 15, 1980 interview, it would be incredible to assert—and we note again that defendant does not make such an assertion— that the defendant was unaware of the purpose of the Government's investigation.

The defendant herein knew that Mr. Gambino had received $125,000.00 in settlement of the Shelburne Hotel litigation. It is this Court's view that he should have been more forthright about this obviously relevant fact. He had, pursuant to the April 15 agreement and particularly in light of the *quid pro quo* offered by the Government, an obligation to disclose the receipt of such a large sum of money.

We emphasize that we have before us a case in which the relevant topic (here the Shelburne Hotel transaction) was, in fact, the subject of inquiry by the government agents. This is not a case in which the relevant topic was left untouched so that the witness might have inadvertently overlooked the entire topic. Indeed, the evidence that the defendant's attention was specifically called to the Shelburne Hotel dealings is unquestionable. Nor do we have a situation where the questioners prohibited, by their conduct during the interview, the volunteering of information by the witness. It is clear even from Mr. Simon's own notes of the April 15 interview that the defendant was given ample opportunity to reveal the receipt of the Shelburne settlement monies. A significant period of time was devoted to discussion of the Shelburne property and to Messrs. Gambino and Skalsky's attempts to acquire the property.

Moreover, it has been established, through the testimony of the I.R.S. agents who were present at the April 15 interview, that the information which the defendant did give the agents on the Shelburne Hotel transaction led these agents to believe that no monies passed between any third party and Messrs. Gambino and Skalsky. (Tr. at 46, 62 & 68). According to Agent Pisker's testimony, the statement contained in the Government's typewritten summary of the April 15 interview that the options which Messrs. Gambino and Skalsky had to buy the Shelburne Hotel "never materialized" was an assertion made by the defendant. (Tr. at 67). In light of the established fact that the defendant and Mr. Gambino had, in actuality, received $250,000.00 in settlement of the lawsuit filed concerning the options to buy the Shelburne Hotel, this statement is affirmatively misleading. Defendant argues that the contemporaneous

notes taken by Mr. Simon, as deciphered by Mr. Simon and summarized in the June 20, 1985 typewritten memorandum to defendant's present counsel, show that defendant informed the agents that a *lis pendens* had been filed against the Shelburne property. It is clear, of course, that a *lis pendens* had not only been *filed,* but that Messrs. Skalsky and Gambino had *released* this claim in exchange for the $250,000.00. Assuming, *arguendo,* that the defendant did mention the filing of the *lis pendens,* this partial disclosure of the facts was also misleading. "In other words, half of the truth may obviously amount to a lie, if it is understood to be the whole." W. Prosser & W. Keeton, *The Law of Torts,* § 106 at 738 (5th ed. 1984) (discussing liability for civil deceit actions based on incomplete disclosure).

Defendant, by his argument that the April 15 agreement did not obligate him to reveal the receipt of the settlement monies because he was not asked explicitly whether any money was made on the transaction, seeks to take advantage of the Government's asserted lack of aggressiveness with respect to acquiring information concerning the Shelburne income. In the same vein, he cites and relies upon *Bronston v. United States,* 409 U.S. 352, 93 S.Ct. 595, 34 L.Ed.2d 568 (1973), and other cases dealing with the standard of conduct required to uphold a conviction for perjury. These cases are inapposite. We do not have a perjury charge here. Nor do we have a situation similar to that in *Bronston,* for example, where the questioner and the person to whom the questions were addressed were in an adversarial relationship. The defendant herein, who knew he was considered only a witness by the Government, and who was not the target of the investigation, had agreed to cooperate with the Government's investigation. Particularly in light of the fact that the Government clearly did ask specifically whether Messrs. Skalsky or Gambino had received "any monies" in each of the several other business deals discussed during the interview, we disagree with defendant's claim that he was under no obligation to reveal the receipt of the Shelburne settlement monies.

Accordingly, the defendant's motion to dismiss the indictment shall be denied. The Court shall enter an appropriate order.